UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JAMES P. LAPLANTE | : | |
| | : | |
| VS. | : | C.A. NO. 05-496-ML |
| | : | |
| ONEBEACON INSURANCE GROUP | : | |

Deposition of DENNIS SMITH, a Witness herein, taken on behalf of the Plaintiff, on TUESDAY, FEBRUARY 21, 2006, 11:00 A.M., at the offices of OneBeacon Insurance Group, One Beacon Street, Boston, Massachusetts, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

Vivian S. Dafoulas, RMR-CRR

50 Fieldstone Drive

East Greenwich, RI 02818-2064

(401) 885-0992

EXHIBIT

A



44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

APPEARANCES:

FOR THE PLAINTIFF:

KEVEN A. McKENNA PC
BY: KEVEN A. McKENNA, ESQUIRE
23 ACORN STREET
PROVIDENCE, RI 02903

FOR THE DEFENDANT:

CARROLL, KELLY & MURPHY
BY: C. RUSSELL BENGTSON, ESQUIRE
PATRICIA BUCKLEY, ESQUIRE
ONE TURKS HEAD PLACE, SUITE 400
PROVIDENCE, RI 02903



INDEX


| WITNESS | PAGE |
| --- | --- |
| DENNIS SMITH | |
| EXAMINATION BY MR. McKENNA | 4 |

| EXHIBITS | PAGE |
| --- | --- |
| 1 News release - CGU Changes Name | 7 |
| 2 OneBeacon submission to Massachusetts and California State Requirements | 10 |
| 3 Organizational chart of White Mountains | 18 |
| 4 York Report of Examination as of 12/31/04 | 18 |
| 5 Potomac Report of Examination | 19 |
| 6 News Release 1/16/06 re Thomas Forsyth | 55 |
| 7 White Mountains 2004 Management Report | 62 |
| 8 OneBeacon 2005 annual report of foreign LLC | 62 |
| 9 OneBeacon application for registration as a foreign LLC | 62 |
| 10 Listing of OneBeacon jobs | 62 |




DENNIS SMITH,

called as a witness and having been first duly sworn, was deposed and testified as follows:

COURT REPORTER: Would you state your name, please?

THE WITNESS: Dennis Smith.

EXAMINATION

BY MR. McKENNA:

Q. Good morning, Mr. Smith.
A. Good morning.
Q. My name is Keven McKenna. I represent the plaintiff in this litigation, James LaPlante. By whom are you employed?
A. OneBeacon Insurance Company.
Q. Is that a separate legal entity?
A. Yes, it is.
Q. And is that the insurance company that's originally incorporated in the state of Pennsylvania?
A. Yes, it is.
Q. We are here at One Beacon Street in Boston, is that correct?
A. That's correct.
Q. How long have you had an office in this building?



A. Since 1977.
Q. In 1977 am I correct that this building was owned and essentially operated by CGU Insurance Company?
A. No, that's not correct.
Q. What is the name?
A. The name of what?
Q. What was -- in '76, '77 when you came --
A. Who owned the building?
Q. Yes.
A. Commercial Union Insurance Company, American Employers Insurance Company, the Employers Fire Insurance Company and the Northern Assurance Company of America. Joint tenants.
Q. Joint tenants?
A. Or tenants in common. I forget which.
Q. You were employed by those entities at that time?
A. At that time I was employed by Commercial Union Insurance Company.
Q. Did there come a time somewhere in 2001 when Commercial Union was purchased by another entity?
A. Be more specific.
Q. The name Commercial Union, what is the





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

correct name of that?
A. At one time there was a company called Commercial Union Insurance Company.
Q. Yes.
A. There was also a group, our group name at that time was Commercial Union -- well, when I started, it was Commercial Union Assurance Companies, later changed to Commercial Union Insurance Companies.
Q. And did there come a point in time when that became OneBeacon Group -- OneBeacon Insurance Group?
A. The group name, yes. Well, not directly. There was an intervening group name.
Q. And what was the intervening group name?
A. CGU Insurance Group or the CGU Insurance Companies or simply CGU.
Q. Am I correct that on or about June 11th, 2001, the name OneBeacon Insurance Group came into being?
MR. BENGTSON: I object to the form. Go ahead.
A. I'm not sure what you mean by "came into being." The entire -- our entire group of companies was purchased on June 1st, 2001 by subsidiaries of



White Mountains Insurance Group Limited and our group name, the group name was changed on or about that date to the OneBeacon Insurance Group or OneBeacon or OneBeacon Insurance. They are all used interchangeably.
MR. McKENNA: I'm going to show you an article from the Insurance Journal dated June 11th, 2001 -- we'll mark it in a moment -- and on the last sentence, where I have underlined the sentence, it says, "OneBeacon Insurance Group functions through insurance companies licensed to do business in all 50 states, selling exclusively via network of independent agents."
I'm going to ask you to take a moment to read this press release and then I'm going to ask you whether -- if it's accurate. I'm going to hand this to the stenographer to mark it as Exhibit 1.
(Whereupon, Plaintiff's Exhibit No. 1 was marked.)
THE WITNESS: Do you want me to read the whole thing?
MR. McKENNA: Yes. If you would take a few minutes to read it, I would appreciate it.
MS. BUCKLEY: You don't have a copy I take it of your exhibits.



MR. McKENNA: Some I do, some I don't. I think if I don't have them, I'll get you copies. They're all on my computer.
MS. BUCKLEY: Well, it's not going to help us right now.
MR. McKENNA: Could you hand me that back for a moment, please? I'd appreciate it.
THE WITNESS: Okay.
BY MR. McKENNA:
Q. Are any of the facts that you read in Exhibit 1 false, to your knowledge?
MR. BENGTSON: I object. Let's see the document back. We are not going to keep doing this. You either give him a document to read and then ask him questions but don't keep taking it back. He's not going to go through these documents that way.
You're asking him to say whether or not June 11th was the right date of the document? How are we going to do that?
A. I mean I don't know. I can't say one way or another. There are -- there are many individual statements and they're using -- they're using a lot of loose terms, group names, so I can't really say whether -- what's correct and what isn't.
MR. McKENNA: Would you hand me back the



document that I asked you particular questions on?
(Witness hands document to Attorney McKenna.)
BY MR. McKENNA:
Q. Do you agree with this statement: "CGU's parent company, London-based CGNU Group, agreed to sell the CGU U.S. property and casualty operations to Bermuda-based White Mountains Insurance Group in September of 2000"?
A. I would say that's not correct.
Q. And what is incorrect about it?
A. Using the general group terms for who bought who and what was bought.
Q. And what did happen in your terminology?
MR. BENGTSON: I object. Go ahead.
A. All of the stock of what was then CGU Corporation was sold by subsidiaries of CGNU PLC to TACK Acquisition Corp., an indirect subsidiary of White Mountains Insurance Group Limited.
Q. Is this a correct statement: "OneBeacon Insurance Group functions through insurance companies licensed to do business in all 50 states, selling exclusively via network of independent agents"?
A. One or more of the individual member

Page 10

companies making up the group known as the OneBeacon Insurance Group operate in -- in all 50 states. Some companies are licensed in all 50, some are licensed to one.

I don't believe we actually write -- currently write insurance in all 50 states. We being, meaning the companies in the group, but some of our companies are licensed in all 50 states plus D.C.

Q. I'm going to -- are you familiar with the requirements of the State of Massachusetts for reporting pursuant to Massachusetts Division of Insurance Bulletin 2000-001-02 the members of the insurance group to the Insurance Commissioner?

A. No, I'm not.

MR. McKENNA: I'm going to show you a document which I'm going to mark as Exhibit No. 2 and give it to the stenographer to put a sticker on it and I'll ask you a question about it.

THE WITNESS: Okay.

(Whereupon, Plaintiff's Exhibit No. 2 was marked.)

BY MR. McKENNA:

Q. Am I correct when we use the term OneBeacon Insurance Group, we are referring to the names of the companies listed on that document which

Page 11

purports to be a report to the Insurance Commissioner of the State of Massachusetts which is available on OneBeacon Insurance Group's Web site?

MR. BENGTSON: I object.

A. Well, I don't know if it is or isn't.

Q. Are you familiar with those companies listed on that document?

A. Some of them have incorrect names. Some are no longer part of the group. Some names have changed. I don't know when this is from. There's an entity here that was dissolved several years ago. Many were sold but I would say aside from name changes and at -- at least one incorrect name that I spotted -- there may be others -- all of these companies at one time were within our group. Not necessarily the same time but --

Q. Is York Insurance Company of Maine a member of OneBeacon Insurance Group?

A. Yes.

Q. You have used the term insurance group with reference to prior owners and to present owners. Could you tell me what the term insurance group means in the insurance business --

MR. BENGTSON: I object. Go ahead.

Q. -- as you use it?

Page 12

A. As I use it --

Q. Yes.

A. -- it means a group made up of individual underwriting companies that write insurance under common ownership.

Q. Okay. So when you were mentioning the prior -- the predecessor group, you were referring to a group of insurance companies that had common ownership?

A. Correct.

Q. And now --

A. Not necessarily 100 percent ownership but --

Q. Close to it?

A. Close.

Q. Now, in your --

MR. McKENNA: Go ahead. I'm sorry.

MR. BENGTSON: Go ahead. Don't pay attention to us.

Q. In your work, are you responsible for preparing documents for state insurance regulatory agencies of the members of the group of OneBeacon Insurance Group?

A. I'm not quite sure I understand the question. Do I -- do I prepare some documents to be

Page 13

filed with state insurance departments?

Q. Yes.

A. Yes, I do.

Q. Okay. And am I correct that you serve as assistant secretary or secretary of several of the members of the insurance group?

A. Correct.

Q. And am I correct that you are the secretary of York Insurance Company of Maine?

A. Correct.

Q. And do you know the names of each subsidiary of which you have a secretarial capacity?

A. Could I rattle them off now, is that your question?

Q. Sure.

A. Probably. I'm sure I'd miss one or two.

Q. Could you tell me which ones you presently recall?

A. Of which I am secretary?

Q. Or assistant secretary or have some responsibility.

A. Well, I'm secretary of all of the insurance company members. I'm assistant secretary of some of the other entities --

Q. Okay.





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

A. -- but all of the companies within the OneBeacon Insurance Group currently, all of the individual insurance companies, I am the corporate secretary. There are roughly 20, 22 of those.

Q. And as I understand your comment, there are other entities that don't sell insurance that are part of the group?

A. Yes.

Q. Would they be reinsurance entities?

A. White Mountains -- the White Mountains group has a whole reinsurance segment. They're not related -- I mean they're affiliated with OneBeacon but we don't have anything to do with those companies, we at OneBeacon. We may use them for reinsurance but --

MR. McKENNA: Before I forget, there's one thing I wanted to put on the record. In this case, James LaPlante who is disabled has been assisted by his father, Joseph LaPlante. Joseph LaPlante was also in the car accident which is the center of the dispute between James LaPlante and OneBeacon Insurance Group.

I had requested counsel to allow him to attend this deposition. Counsel objected because, according to the cases provided to me by counsel,



counsel viewed Mr. LaPlante as just a member of the public, like a television station that might want to just come in and film these proceedings.

Mr. LaPlante is a person who is important to me and my client in preparing this case because of the wealth of knowledge he has and the wealth of contacts he's made in this case on behalf of his son, and I just want the record to note that I object to conducting this deposition without his assistance.

I realize that Mr. Smith may not have anything to do with that decision by his counsel but I would just like to note it on the record for further consideration at an appropriate time in these legal proceedings.

BY MR. McKENNA:

Q. When an insurance group operates as a group, they report to the Securities and Exchange Commission in a 10-K report as one entity, is that correct?

MR. BENGTSON: I object. Go ahead.

A. No, that's not correct.

Q. Would you -- are you familiar with the 10-K report?

A. I've seen it.



Q. Do you help prepare it?

A. No.

Q. Okay.

A. I assume you're talking about the White Mountains Insurance Group Limited --

Q. Yes.

A. -- 10-K?

Q. Yes.

A. Yes.

Q. You have read that?

A. Yes. Not word for word -- it's rather voluminous -- but I've seen it.

Q. Of course. Have you ever attended in person a meeting of York Insurance Company of Maine in Portland, Maine?

MR. BENGTSON: Did you say in Portland, Maine?

MR. McKENNA: Yes.

A. Have I ever been in Portland, Maine?

Q. To attend a meeting as their secretary.

A. No.

Q. Am I correct that the liabilities of one -- sorry -- of York Insurance Company of Maine are completely reinsured by entities which are members of the White Mountains Insurance Group LTD?



MR. BENGTSON: I object. Go ahead.

A. Be more specific. I'm not --

Q. Can you tell me what a reinsurance agreement is?

A. In general? Just shorthand?

Q. Yes.

A. It's one company cedes a certain amount of its business in some form or other to -- to an assuming company, also an insurance company or reinsurance company.

Q. Am I correct -- I think from reading your affidavit -- that the York Insurance Company of Maine's liabilities for claims are completely reinsured by entities that are within the holding company structure of White Mountains Insurance Group LTD?

MR. BENGTSON: I object.

A. York reinsures 100 percent of its business with OneBeacon Insurance Company, if that's what you're asking.

Q. And OneBeacon Insurance Company is the company by whom you are employed?

A. Correct.

MR. McKENNA: And just so I understand the corporate structure, I'm going to ask you a question





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

and I'm going to utilize an exhibit which I took from a report by the Pennsylvania Insurance Commissioner, and I'm going to ask you questions --
THE WITNESS: Uh-hum.
MR. McKENNA: -- from this chart of accounts, chart of corporate structure. I'm marking it as No. 3 and I'm asking the stenographer to take a second and mark that.
(Whereupon, Plaintiff's Exhibit No. 3 was marked.)
MR. McKENNA: I'm going to mark as Exhibit 4 an exhibit I previously marked as Exhibit 4, the York Insurance Company of Maine Report of Examination as of December 31st, 2004, and I'm going to refer the deponent to Page 4 of 12 which I believe has a similar chart. I'm going to ask some questions about that.
(Whereupon, Plaintiff's Exhibit No. 4 was marked.)
THE WITNESS: Did you say Page 4?
MR. McKENNA: Page 4 is the chart.
THE WITNESS: Okay.
BY MR. McKENNA:
Q. Now, I realize these charts were made at different times.



THE WITNESS: Right. For starters. Now, where did this --
Q. That came from the Pennsylvania Insurance Commissioner report which is available.
A. An examination report?
Q. Yes. Here it is.
A. Just so I know the context.
MR. McKENNA: One second. I think I have a full copy here.
THE WITNESS: I just wanted to know the general context.
MR. McKENNA: I have two copies. I have the full copy here and I'll mark this as Exhibit 5.
(Whereupon, Plaintiff's Exhibit No. 5 was marked.)
THE WITNESS: Okay.
MR. BENGTSON: You can see it on there. It says Potomac.
THE WITNESS: Okay.
BY MR. McKENNA:
Q. Am I correct that you as the secretary or assistant secretary of these various insurance companies that are members of OneBeacon Insurance Group, that you are familiar with their legal structure?



A. Yes.
Q. All right. If you could start with the most recent report that I have which appears --
A. The Maine?
Q. -- which appears to be the one for Pennsylvania --
A. Oh, one second. That's at the end of 2001. The more recent one I believe --
Q. Is York Insurance maybe. Which one is the more --
A. The York report by -- the report says this is as of the end of '04, 2004.
Q. All right.
A. The Pennsylvania report appears to be at the end of 2001.
Q. All right. Let's use the most recent report of York Insurance Company of Maine. I would like you to take a look at the structure --
A. Uh-hum.
Q. -- that's set forth in the York Insurance Company of Maine's examination by the Commissioner of the State of Maine.
A. Uh-hum.
Q. If we could start at the bottom and move up the chart --



A. Uh-hum.
Q. -- is the York Insurance Company of Maine information that's -- that's included in the block on the bottom accurate?
A. The name is correct and it is a Maine corporation.
Q. Okay. And the next level is what?
A. OneBeacon America Insurance Company. That's the correct name and that is a Mass. corporation.
Q. What is the next level?
A. OneBeacon Insurance Company, a Pennsylvania corporation, that's correct.
Q. What's the next company?
A. OneBeacon Insurance Group LLC and that is -- that's the correct name, that is a Delaware limited liability company.
Q. Are the legal relationships that are attempted to be displayed on that chart by the Insurance Commissioner of Massachusetts correct, to your knowledge?
MR. BENGTSON: I object to the form.
A. I'm not sure what -- what his -- his intent was.
MR. BENGTSON: It's Maine.

MR. McKENNA: Of Maine. Did I say Maine?
MR. BENGTSON: You said Massachusetts.
MR. McKENNA: I'm sorry. I misspoke.
MR. BENGTSON: Okay.
BY MR. McKENNA:
Q. Now, can you -- but you have knowledge of what their legal relationship is, correct?
A. Correct. And we are talking the end of '04, is that right? Yes.
Q. Would I be correct in assuming here in February of 2006 that any of those relationships have not changed?
A. Well, by relationships I assume you mean that a box below another box means 100 percent ownership of one company by another, and that is correct. York being 100 percent owned by OneBeacon America, which is 100 percent owned by OneBeacon Insurance Company, which is 100 percent owned by OneBeacon Insurance Group LLC.
The implication here from this chart is that OneBeacon Insurance Group LLC is a direct wholly owned sub of White Mountains, White Mountains Insurance Group Limited. That's not correct. There are several other companies in between but it does say it's an abbreviated organizational chart, so



accepting that there's an indirect ownership there, it is correct. The LTD is -- I believe is -- is initial caps only, capital "L" and I believe there is a period after the "D", but other than that, it's essentially correct, and it is a Bermuda corporation.
Q. Do each of these entities sell insurance?
A. No.
Q. Tell us the ones that do.
A. York Insurance Company of Maine, OneBeacon America Insurance Company and OneBeacon Insurance Company.
Q. Am I correct that OneBeacon Insurance Group LLC does not sell insurance?
A. That is correct.
Q. Now, I noticed -- let's get back. OneBeacon Insurance Group is a copyrighted name according to your Web site as of 2006; is that a correct statement?
A. I don't know. I don't work on trademarks --
Q. Okay.
A. -- or copyrights.
Q. Okay. What person would be in the OneBeacon Insurance Group or any of its corporations



would be responsible for providing knowledge as to who owns the copyright OneBeacon Insurance Group?
A. It would be one or more of the lawyers in the law department where I work.
Q. So would you know the name of the person who would have that knowledge?
A. Not specifically at this moment. I could find it.
Q. And who is the person who is the head of the law department?
A. Right now it's a fellow named Tom Forsyth. He's the general counsel.
Q. He was -- he was appointed general counsel last year, is that correct?
A. This year.
Q. And his -- he would be employed by which entity?
A. OneBeacon Insurance Company.
Q. York Insurance Company of Maine has signed the -- signed powers of attorneys with various members of the OneBeacon Insurance Group to handle functions for them, isn't that correct?
A. They may have. I know nothing about that.
Q. Do you have a power of attorney to sign reports on behalf of the directors of One -- strike



that -- the York Insurance Company of Maine?
A. Do I have a power of attorney to sign reports? I don't know what you mean.
Q. Do you know what a power of attorney is?
A. Generally, yeah.
Q. Tell me what you think it is.
MR. BENGTSON: I'm going to object. Go ahead.
A. It's a piece of paper that says I grant -- I, so-and-so, grant so-and-so power of attorney to do various things.
Q. Do you know John Byrne?
A. Yes, I've met him.
Q. Do you have any powers of attorney from him?
A. No.
Q. Am I correct you prepared and signed the annual report for York Insurance Company of Maine?
A. What do you mean by annual report?
Q. Is there -- are you familiar with a state law in Maine that requires any corporation to file an annual report with the Secretary of State of Maine?
A. You're not talking about the insurance company annual statement? You're talking simply an

annual report filed with the Secretary of State?
Q. Correct.
A. I don't believe I do sign that. I think that's signed by the clerk but I -- I could be wrong.
Q. Do you have -- do you have a power of attorney to do that?
MR. BENGTSON: I object.
A. I'm an officer --
MR. BENGTSON: Hold on. To sign it on his own?
MR. McKENNA: Yes.
A. No.
Q. Is there -- are there annual meetings -- are there annual meetings of the directors of York Insurance Company of Maine?
A. There are quarterly meetings.
Q. Do you attend these meetings?
A. I do.
Q. And where are those meetings held?
A. Generally here in Boston.
Q. Okay. Do you know who are the directors of York Insurance of Maine?
A. I do.
Q. And who are they?



THE WITNESS: Currently?
MR. McKENNA: Yes.
A. I may not get them all right. I'd have to double-check my own lists but I'm just -- I'm not using full names I just -- Alex Archimedes, Drew Carnase, Tom Forsyth, Paul McDonough, Mike Miller, Pat Lavoie, Mike McSally. I'll offend some people by forgetting them. Tom Schmitt. I'm sure I'm leaving a couple out. Those -- those names come to mind. Roger Singer.
Q. Am I correct that those gentlemen, some of those gentlemen, perhaps all, are also directors of other insurance companies within the OneBeacon Insurance Group?
A. Some are.
Q. Mr. Michael Miller, does he also hold other directorships?
A. Yes.
Q. And is he -- is he also the president of OneBeacon Insurance Group LLC?
A. Yes.
Q. And is he the president of any other entity?
A. Yes.
Q. Which entities?



A. Several.
Q. Is he the president of the company for which you work, OneBeacon Insurance Company of Pennsylvania?
MR. BENGTSON: I object.
A. Of Pennsylvania is not part of the name but he is president of OneBeacon Insurance Company.
Q. And is he president of each of the companies in the holding company hierarchy from York Maine to One --
A. No.
Q. No, okay. Is there, to your knowledge, an agreement between your company --
A. My company?
Q. Meaning the company by whom you are employed --
A. Okay.
Q. -- and One York Insurance Company to handle claims?
MR. BENGTSON: I object. One York Insurance Company? That's a new name?
MR. McKENNA: I'm sorry. York Insurance Company of Maine.
A. Is there an agreement that covers claims handling?



Q. Yes.
A. Is that your question?
Q. Yes.
A. Yes.
Q. And could you briefly describe it?
A. It's 100 percent reinsurance agreement by which York Insurance Company of Maine cedes 100 percent of its insurance business to OneBeacon Insurance Company, which in turn assumes all of that business in exchange for receipt of premiums and it handles the claims on policies written by York Insurance Company of Maine.
Q. If a check is written out to OneBeacon Insurance Group, into what account is it deposited?
MR. BENGTSON: I object.
A. I have no idea.
Q. Do you agree that income, premium income, for OneBeacon Insurance Group is reported to the Securities and Exchange Commission at the group level?
MR. BENGTSON: I object.
A. I have no idea.
Q. Is there an agreement between -- on reinsurance and claims management between OneBeacon Insurance Company by whom you are employed and any

other entity?
A. Yes.
Q. And what would that entity be?
A. Well, there are -- OneBeacon Insurance Company is party to probably hundreds of agreements. What specifically are you looking for?
Q. Are they all agreements within the White Mountains Insurance Holding Company LTD?
MR. BENGTSON: I object.
A. Well, are what?
Q. The contracts for reinsurance between your entity and others.
MR. BENGTSON: I object.
A. Not all.
Q. What other entities could be paying -- might be paying by contract claims made by policies owned by York Insurance -- issued by York Insurance, reinsured by, in the first instance, by OneBeacon Insurance Company by whom you are employed?
MR. BENGTSON: Is that a question?
MR. McKENNA: Yes.
MR. BENGTSON: Don't answer.
A. I don't understand the question anyway. I couldn't answer it.
MR. BENGTSON: You said might. We're not



going to be doing mights here today.
MR. McKENNA: We'll amend that question and say would --
MR. BENGTSON: I think you better start all over again.
THE WITNESS: I didn't understand the question to begin with regardless of the verbs.
Q. The company by which you are employed, OneBeacon Insurance Company --
A. Uh-hum.
Q. -- has agreements with -- do they have agreements of reinsurance with other companies within the holding company structure?
A. Correct. Yes.
Q. All right. Do any of those agreements cover claims that would originate with a policy that was initially underwritten by York Insurance Company of Maine?
A. You're only talking about reinsurance within the group --
Q. Yes.
A. -- or other agreements?
Q. Yes.
A. Just offhand, I think the only other agreement that would apply here, the way you've



structured the question, would be the pooling, intercompany pooling agreement that involves OneBeacon Insurance Company and several affiliated companies.
Q. And so the record is clear, can you tell us what the term "pooling agreement" means?
A. It's a term that's common in the insurance industry with insurance company groups. In our case, several affiliated companies -- I don't recall the exact number -- somewhere around ten, nine, ten, eight, several affiliated companies cede their insurance business into OneBeacon Insurance Company which assumes that business. It in turn retrocedes that business and cedes a portion of its own business back to those affiliated companies in various percentage shares.
OneBeacon Insurance Company retains the largest percentage of the members of the pool and York, to go back to your earlier question --
Q. Yes.
A. -- the York business would be covered by that because it has previously been ceded into OneBeacon Insurance Company by York.
Q. The term "cede," which I understand is spelled C-E-D-E --



A. Uh-hum.
Q. -- is a term of art in the insurance business with which you are familiar, is that correct?
A. Generally, yes.
Q. Could you just basically, in your own words, as you understand it, tell us what the term cede means and what the term re-cede means?
A. Retrocede you mean?
Q. Retrocede, yes.
A. Cede is when an insurance company transfers some amount of some portion of its business to another, to a reinsuring company, which assumes that particular amount of business.
Retrocede is when that -- the -- the reinsurer, the company to whom business was ceded, further cedes it to another company, reinsuring company, either, you know, a portion back to the original ceding company or to another company within the group or to an outside reinsurer, an unaffiliated insurer.
I'm not a reinsurance expert by any means but that's my general understanding.
Q. The company within which the insurance business is ceded, do they assume responsibility for

Page 34

any mistake that that company might make in the handling of a claim?
MR. BENGTSON: I object.
A. I don't understand the question.
Q. Well, if a --
A. You'd have to -- just to shortcut it, you would have to read the provisions of the reinsurance agreement. I assume some -- you know, terms of every reinsurance agreements are different. I can't answer that as a general matter is what I'm trying to say.
Q. Well, can we agree on a couple of simple facts in regard to the relationship between York -- and I'd like to use that as a shortcut for York Insurance Company of Maine --
A. Fine.
Q. -- is that all right?
A. Yes.
Q. -- and OneBeacon Insurance Company --
A. Uh-hum.
Q. -- as a second term. Having defined those two terms --
A. Uh-hum.
Q. -- can we agree that, to your knowledge, OneBeacon Insurance Company has the authority to

Page 35

determine the claims of York on automobile insurance issues?
A. When you say determine them, you mean handle them, settle them?
Q. Yes.
A. Yes.
Q. And the -- if OneBeacon Insurance Company settled a claim for whatever amount of dollars, "X" amount of dollars --
A. Uh-hum.
Q. -- and they sent the insured a check to pay the claim --
A. Uh-hum.
Q. -- after it's settled --
A. Uh-hum.
Q. -- from which banking account, from what entity would that come?
A. I don't know.
Q. Who would know the answer to that question?
A. Whoever handles their bank accounts.
Q. And who would that be?
A. We have a whole floor of corporate accounting department. Someone down there.
Q. Your corporate accounting department, am I

Page 36

correct, handles all the finances for all the members of the group, am I correct?
A. By "group" you mean the OneBeacon Insurance Group?
Q. Yes.
A. Well, as opposed to the White Mountains Insurance Group?
Q. Right.
A. In a general sense, yes.
Q. You mean --
A. Data processing is handled somewhere else and so forth and so on but as a general matter, that's correct.
Q. Is the purpose of an insurance group to gain efficiencies at a higher level for claims management, accounting, legal issues, things of that nature?
THE WITNESS: Is that the purpose of the group?
MR. McKENNA: Yes.
A. I guess among other things.
Q. I mean the -- you've -- you've worked for two entities which you use the name "group" in your professional lifetime, right?
A. I work for two entities, three entities

Page 37

actually that are members of a group.
Q. Okay.
A. If that's what you mean, yes.
Q. So the present group that you are working for --
A. Well, I work for OneBeacon Insurance Company.
Q. But that OneBeacon Insurance Company is a member of a group of companies --
A. Yes.
Q. -- which use the name I guess, according to our affidavit, OneBeacon Insurance Group?
A. Correct.
Q. And the entity that is known as OneBeacon Insurance Group LLC --
A. Uh-hum.
Q. -- is a specific corporation with specific --
A. Not a corporation.
Q. I'm sorry. Limited liability company. Whose legal existence is separate and distinct from this group that we referred to, correct?
A. Group is just a trade name covering all the members.
Q. Well, isn't it more than a trade name --





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

Page 38

MR. BENGTSON: I object.
Q. -- don't they share services?
MR. BENGTSON: I object. Go ahead.
A. The individual companies do, yes.
Q. All right. Would this be a fair statement that the members of the group share overhead functions?
MR. BENGTSON: I object.
A. I can't -- I can't give you details on the -- how the accounting is handled.
Q. Well --
A. In layman's terms, I guess that's correct.
Q. Well, for example, you are a member of a law department, correct?
A. Uh-hum.
Q. And your law department of which you are a member of, employed by, handles legal work of other entities such as York Insurance Company of Maine?
A. Correct.
Q. And so to that extent, in terms of shared legal services, members of the group try to economize services by sharing them?
A. I guess.
Q. I mean, well --
A. If we could do it, we'd operate as one

Page 39

single company but that's not -- you can't do that in 50 states.
Q. But to the extent possible, in the legal area with which you are familiar, these groups try to exchange services?
A. Correct.
Q. Where you've done --
A. In a general sense.
Q. -- you've done legal work for more companies than your own, correct?
MR. BENGTSON: I object.
A. Well, they're all my own in the sense that they're all -- I only have one employer as a technical matter --
Q. Yes.
A. -- but I'm secretary of all of the companies. I mean they're all within the same common ownership.
Q. You don't receive any more money or any less money for the number of entities for which you provide legal services?
A. I wish I did. No, I don't.
Q. Are you familiar with any of the adjusters?
A. No.

Page 40

Q. Do you have any dealings with the claims department?
A. No.
Q. Who would be the person in the claims department of OneBeacon Insurance Group who would be familiar with the names of the persons who worked there in the last three years?
A. I have no idea.
Q. Do you know Stephen P. Schroeder (phonetic)?
A. No.
Q. Have you ever heard the name Carl Kallenberg?
A. I think I saw it in some exhibits that I reviewed but I don't know the -- I'm not familiar with him personally.
Q. Do the members -- strike that. We are in a building that was formerly owned by a group of insurance companies as joint tenants as you said earlier?
A. Uh-hum.
MR. BENGTSON: Is that a yes?
THE WITNESS: Yes.
Q. Is that correct?
A. Yes.

Page 41

Q. And I noticed in this building, perhaps on this floor or the tenth floor, a sign on the door that said I think Human Resources, OneBeacon Insurance?
A. Uh-hum. Tenth floor.
Q. Do you know who is the head of that unit?
THE WITNESS: Who is the chief human resources officer?
MR. McKENNA: Yes.
A. Yes, I do.
Q. What is the name of that person?
A. Thomas Schmitt, S-C-H-M-I-T-T.
Q. And is Mr. Schmitt located in this building at OneBeacon Street, Providence -- Boston?
A. Yes, he is.
Q. Do you know if the human resources department has information on employees of the various members of the group of OneBeacon Insuranc Company -- OneBeacon Insurance Group?
A. All -- all people who work for the group are employed by OneBeacon Insurance Company, but lost the question.
Q. Let me just repeat it, make sure I understand your answer.
OneBeacon Insurance Company referring to the





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

Delaware -- strike that -- to the Pennsylvania incorporated company --
A. Right.
Q. -- employs persons who provide services to all the groups?
A. All the companies.
Q. All the companies?
A. That are part of the OneBeacon Insurance Group, yes. That's correct.
Q. Thank you.
A. Just a single employer. It's probably a tax or a labor law requirement but -- I don't know -- but there is only one employer within our group.
Q. I just had a couple of miscellaneous questions. I noticed in the 10-K report of 2005 that there are several other entities that appear to be in the holding company structure and I was wondering if you know --
A. Uh-hum.
Q. -- who they are. Below White Mountains there appears to be an entity --
A. When you say White Mountains, you mean --
Q. White Mountains Insurance Group Limited.
A. Insurance Group Limited.



Q. -- there appears to be two Delaware entities, I believe use the name funding corporation or something to that effect?
A. Fund American?
Q. Yes. What is the purpose of that entity, if you know?
MR. BENGTSON: I object.
A. Well, there are two of them.
Q. All right.
A. Well, there are now three. Starting from OneBeacon Insurance Group LLC going up, Fund American Companies, Inc., Fund American Enterprises Holdings, Inc., and Fund American Financial Services, Inc. They -- and the latter may not -- I can't remember when that got into the picture. It may not have been in that -- shown in that 10-K.
Q. Okay.
A. They're all intermediate holding companies.
Q. I see.
A. They have various functions. Some of them have issued preferred stock, some of them -- one of them, I believe, has some public debt.
Q. Okay.
A. But they're not part of -- we don't



consider them part of the OneBeacon Insurance Group
Q. All right. Fine. Thank you on that. I noticed also another entity named Folksamerica.
A. Uh-hum.
Q. What, if anything, does that entity do?
A. Well, that's a group name as well, the Folksamerica group.
Q. Okay.
A. They're involved in primarily -- they're based in New York City. They're primarily involved -- well, or maybe totally. Well, primarily involved in reinsurance. They are part of the reinsurance -- overall reinsurance operation of White Mountains Insurance Group.
Q. And am I correct the entity known as White Mountains Re is also another reinsurance entity?
A. That's -- that's the overall reinsurance group or I mean there's a specific entity with a further name, you know, but --
Q. Right.
A. -- but yes, the Folksamerica group is sort of a subgroup of the White Mountains Re group which includes some Swedish companies named Sirrius and I think some various other operations. Other than knowing of their existence, I'm not really familiar



with them in any detail.
Q. The 10-K report of White Mountains LTD have several references to the operation of the OneBeacon's insurance subsidiaries?
A. Uh-hum.
Q. Could you tell us, if you know, who would have been responsible for the preparation of that information for the 10-K report?
A. I don't know for sure.
Q. Would that be within the legal department of your group?
A. I've been asked various questions from time to time, you know, in connection with -- with that and other matters, but it's -- it's obviously -- they get input from -- it's prepared at the White Mountains level primarily by the people up in New Hampshire, Hanover, New Hampshire, and they get input from, you know, the entire -- entire White Mountains group on various issues and a lot of it they just handle themselves. They have their own general counsel, they have accounting people and so forth and so on.
Q. Would Mr. Forsyth, your new general counsel, have knowledge of that information?
A. No more so than -- than me, especially

since he only started here about a month ago.
Q. Is it within your ability to provide information to your counsel as to the lead person or the person with the most knowledge regarding the section of the 10-K that relates to OneBeacon Insurance Group?
A. Your question kind of rambled on.
Q. Can you find out for us what person is responsible -- or group is responsible, persons, at the White Mountains level in Hanover for the writing of the information related to --
A. As I said, it's -- it's a combined effort of many people. I mean I could name some of the people who are involved but --
Q. Well, do you know who handles the information on OneBeacon Insurance Group?
THE WITNESS: For the 10-K?
MR. McKENNA: Yes.
A. There would be numerous people.
Q. Can you name one person?
A. Myself. I already said I occasionally get questions which I answer.
Q. Are you familiar with the Sarbanes-Oxley Act?
A. I've heard of it. That's about as far as



it goes. I mean I'm aware in very, very general terms.
Q. Does your office have a responsibility for the enforcement of that statute within your group?
A. Not specifically.
Q. Do you know what persons are responsible for the -- let me put it differently. Do you know who is the executive officer who files the certifications under the Sarbanes-Oxley Act for OneBeacon Insurance corporate entities?
A. No, I don't. Do I know the -- if you told me who the individual was, I could tell you whether I knew him or her but do I know which individual does Sarbanes-Oxley certifications? No, I don't.
Q. Michael Miller is the present chief executive officer of OneBeacon Insurance Group, correct?
A. Which entity?
Q. Well, it's my understanding he -- he has authority over all of them.
A. He's president and CEO of OneBeacon Insurance Group LLC. He also holds that title in most, but not all, of our insurance company members.
Q. And John Cavoores --
A. Cavoores.



Q. -- was his predecessor?
A. Correct.
Q. Can you find out for us whether Mr. Cavoores or his successor, Mr. Miller, has filed an executive officer certification under the Sarbanes-Oxley Act of 2002 and whether you could provide that to us?
MR. BENGTSON: I object. Any requests come to us, not through Mr. Miller, so if you have a request, you ask it of us, not through Mr. Miller.
MS. BUCKLEY: Mr. Smith.
MR. BENGTSON: Mr. Smith.
MR. McKENNA: Well, I want to know if that information exists.
MR. BENGTSON: You can ask him if it exists but any request comes to us, not through questions of Mr. Smith.
MR. McKENNA: Well, I need to know in discovery under Rule 26 information leading to other discovery. I'm looking for a copy of this, long story short.
MR. BENGTSON: Isn't that a very simple thing, to send a letter, and if we think it's relevant, we'll provide it; if we think it's not, we'll object to it. Let's not waste time.



MR. McKENNA: We're wasting time by not paying my client his claim.
MR. BENGTSON: You make another remark like that, this is going to be a short deposition, Mr. McKenna.
MR. McKENNA: Well, you're making paternalistic remarks also which is not like you.
MR. BENGTSON: No, we're supposed to be focused on your motion and our motion, not the 10-K report. I let this go for a long time and it's about to stop. It's an hour into this.
MR. McKENNA: I'm sure you agree that the purpose of discovery is to lead to discoverable information.
MR. BENGTSON: No. This is discovery you asked for because of the motions we filed and you filed. That's where we're going to be staying.
BY MR. McKENNA:
Q. Am I correct that if I asked you questions about the claims process that is undertaken by your company, the company by which you are employed, you wouldn't be familiar with that; is that correct?
A. Would or wouldn't be?
Q. Would not be.
A. Correct.

Q. You are familiar with limited liability companies?
A. Yes, I am.
Q. OneBeacon Insurance Group LLC --
A. Uh-hum.
Q. -- is that -- that means it is a limited liability company, am I correct?
A. Correct.
Q. Other than other insurance companies, does OneBeacon Insurance Group LLC hold any other assets?
A. I'd have to look at their balance sheet. I know it owns the stock of -- of several non-insurance companies. I assume they have a certain amount of cash, other investments, so forth, but...
Q. Other than its holding companies' functions, it doesn't have any -- any individual functions relating to the determination of insurance claims or the receipt of insurance policy premiums, is that correct?
A. Correct.
Q. On or about April -- well, I don't know what date you did this. On or about January 31st, 2006, you signed an affidavit which was entitled Supplemental Affidavit of Dennis R. Smith --



A. Uh-hum.
Q. -- which has been used in this litigation and I'd like to ask you a question about Paragraph 1 and 2.
A. Uh-hum.
Q. Is your counsel showing you that as I speak to you?
A. Yes.
Q. With regard to Paragraph 1 where it says the sole member of OneBeacon Insurance Company --
A. OneBeacon Insurance Group.
Q. -- LLC, I'm sorry, is Fund America Companies, Inc., a Delaware corporation with its principal place of business at OneBeacon Street, Boston, Massachusetts, 02108?
A. Uh-hum.
Q. Can you tell me who the -- am I correct that the managers of OneBeacon Insurance Group LLC are listed on the attachment that you had provided in the report of a foreign corporation doing business in Massachusetts to the Secretary of State?
MR. BENGTSON: I object. Go ahead.
A. If it's the document I'm thinking of, then -- then yes, that's correct.
Q. And the managers let me -- strike that.



As you and I understand it -- as you understand it --
A. Uh-hum.
Q. -- as you understand it, managers of an LLC are similar in responsibility to the directors of an I-N-C, an incorporated --
A. I would agree with that in a general sense.
Q. And the same people who are managers of -- many of the same people who are managers of OneBeacon Insurance Group LLC are also directors of related entities in the OneBeacon Insurance Group?
A. Several are. I'm not sure what many means but --
Q. Several?
A. There are, you know, several individuals on the board of managers of OneBeacon Insurance Group LLC who also have various roles within one or more of the insurance companies below that entity.
Q. OneBeacon Insurance Company which was at one time incorporated in the state of Pennsylvania --
A. Uh-hum.
Q. -- am I correct in saying that is a corporation?



A. That's correct.
Q. It's not a -- it is not some special charter from the state of Pennsylvania to do things that only it can do? It is not -- it's a general incorporation statute as opposed to a special act?
A. Correct. It is an insurance company but it's -- yes, it's -- it's a Pennsylvania regular business corporation.
Q. Did you play any role in the drafting in 2001 and 2002 of the automobile insurance policies?
A. No.
Q. Are you familiar with the Insurance Service Office, Inc. known as ISO?
A. I've heard of it.
Q. You have not dealt with them at all?
A. No.
Q. Okay. With regard to this particular case entitled James LaPlante versus OneBeacon Insurance Company, were you familiar with this controversy at all prior to James LaPlante suing OneBeacon Insurance Group?
MR. BENGTSON: I object. You got the name wrong.
MR. McKENNA: I'm sorry.
MR. BENGTSON: That's okay. You got the

name of your case wrong.
MR. McKENNA: James LaPlante versus OneBeacon Insurance Group?
MR. BENGTSON: That's what the caption says.
MR. McKENNA: Right.
THE WITNESS: You said company in your question.
MR. McKENNA: Did I say company? I'm sorry. Let me repeat the question then.
BY MR. McKENNA:
Q. Prior to this lawsuit coming into existence, had you had any knowledge of James LaPlante's claims --
A. No.
Q. -- against this company?
A. No.
Q. Or any company for that matter?
A. No.
Q. I'm not referring to information that you received -- you might have received from your attorneys but are there any files -- are you familiar with the existence of any files within OneBeacon Insurance Company relating to James LaPlante?



A. No.
MR. McKENNA: I'm going to show you what has been marked in another proceeding as Exhibit 8. I'm going to mark it here as Exhibit 6 and I want to -- it's regarding litigation, a department of which you are a member. I just want to ask you a brief question. I'll ask the stenographer to put a sticker on it and show it to the deponent.
(Whereupon, Plaintiff's Exhibit No. 6 was marked.)
THE WITNESS: Okay.
Q. You are familiar with Thomas Forsyth, are you not?
A. Yes, I am.
Q. And I just want you to take a moment to read the exhibit I gave you and tell me, not in terms of his personal life but in terms of his appointment, is the first line of that press release correct?
A. No.
Q. If you could read it and tell me what's incorrect, I would appreciate it.
A. Well, OneBeacon Insurance Group meaning a group as we've been using it here today is not a subsidiary of White Mountains Insurance Group



Limited. It's -- it's a unit, it's a segment. People that put these together are supposed to come to the law department for review ahead of time. Since it was our boss they were announcing hiring, maybe they didn't on this one, but he was appointed and elected to these positions on January 16th.
Q. Okay. With regard to the exhibits that I've shown you from the state of Maine and the state of Pennsylvania --
A. Uh-hum.
Q. -- related to the reports by those regulatory agencies, if you could just take a few minutes to glance at those exhibits and tell me whether or not they appear to you to be authentic reports of the insurance agency that made those reports and whether or not there seems to be to you any material information regarding things within your authority that might be incorrect.
A. I would have to -- I would have to spend an hour or so going through them.
Q. Okay.
A. I can't tell you whether this is an authentic report certainly.
MR. BENGTSON: Which exhibit are you looking at now, Mr. Smith?



THE WITNESS: This is Exhibit 4.
MR. BENGTSON: Okay.
THE WITNESS: Purports to be a report of exam of York Insurance Company of Maine. I mean i looks like it's authentic but I don't know that.
MR. McKENNA: Could I ask a question of the stenographer? What time is it?
COURT REPORTER: 12:25.
BY MR. McKENNA:
Q. If we took a break for lunch and came back, could you answer that question?
A. I'd like to just get this over with, if that's all right.
Q. All right. How would you like to --
MR. BENGTSON: We're not going to do this today, I can tell you that.
A. Ask me a specific question, I'll tell you whether I think it's correct or not. I can't comment on this whole report.
Q. Well, you are familiar, based on your testimony, as I understand it, with the method by which York Insurance Company of Maine came into being in the group which you represent, correct?
A. I don't think you've asked me that before but how it became a member of our group I am





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

familiar with, yes.
Q. Maybe it would be easier if you simply just describe that process.
A. York Insurance Company of Maine was acquired by Commercial Union Insurance Company, I believe, in July of 19 -- July or August of 1997.
Q. And what was the next step after that? I mean what year was White Mountains incorporated?
A. Was White Mountains?
Q. White Mountains LTD formed.
A. I don't know offhand.
Q. The group to which you are referring in 1997 was --
A. I said Commercial Union Insurance Company. That's a -- that's the entity that purchased York Insurance Company of Maine, not the group. I mean it was a member at that time of the Commercial Union Insurance Companies.
Q. And then am I correct that eventually, at some point in time after other purchases, York Insurance Company of Maine became what it is today?
MR. BENGTSON: I'll object to the form. Go ahead.
A. In what sense? I don't know what you mean, became what it is today.



Q. From the CGU purchase to the present.
A. Are you talking about group names?
Q. Tell us -- could you tell us when it became OneBeacon Insurance Group?
THE WITNESS: When that group name was adopted?
MR. McKENNA: Yes.
A. I think I did tell you but it was June of 2001.
Q. And at that time, June of 2001, was York Insurance Company of Maine a member of the group?
A. Well, it didn't have that name then. It was then named Commercial Union York Insurance Company. It was part of the group that White Mountains acquired, yes, in 2001. It's been a member of a group that has changed its name at least twice since 1997.
Q. And do you recall when the name was changed to the present name?
A. From York -- from Commercial Union York Insurance Company to York Insurance Company of Maine?
Q. Yes.
A. I believe it was sometime in the latter part of 2001.



Q. Has there been any change in the relationships between York Insurance Company of Maine with other members of the group since 2001?
A. You mean in the corporate structure, the ownership --
Q. Yes.
A. -- of corporations? There may have been, you know -- companies are, you know, often being repositioned and -- and so forth. I don't think so but I can't answer that for sure from my recollection.
Q. When you use the term reposition, what do you intend to mean by that term, reposition?
A. Any given individual company which is owned by one parent, it may be moved up a level, down a level, moved, ownership within the group has changed from time to time for various reasons, and some companies are sold outside of the group and other new ones are acquired.
York of Maine has been a subsidiary of what is now OneBeacon America Insurance Company since shortly after its acquisition. There was a -- a holding company in between there when we acquired York which was merged into York Insurance Company of Maine, I believe, as I recall.



Q. Are you familiar with the White Mountains Insurance Group LTD 2004 management report related to OneBeacon?
A. Related to OneBeacon?
Q. Describing the --
A. I've seen that management report. I'm not very familiar with it. I -- I probably read it at the time it came out.
Q. I'm going to mark as the next exhibit, Exhibit No. 7, the cover sheets and pages written by John P. Cavoores --
A. Cavoores.
Q. -- to the shareholders are at Paragraphs 21, 22, 23 and 24. And ask you whether or not this appears to be an authentic copy of the report as it relates to --
A. I can't answer that without even looking at it.
Q. Well, I was going to show it to you.
A. Well, I can look at it. I still can't tell you if it's an authentic report but --
Q. You've read that?
A. I read it in 2004. I'm not -- I don't know if that's an actual copy or not. If you're telling me it is, I'll take your word for it but I





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d

Page 62

can't authenticate it.
Q. Well, can you tell me whether it appears to be the same one that you read in that time period?
A. I can tell you whether I think it is.
MR. McKENNA: All right. Let me give this to the stenographer.
(Whereupon, Plaintiff's Exhibit No. 7 was marked.)
THE WITNESS: Let me stand for a minute.
MR. BENGTSON: Let's take a break.
(R E C E S S)
MR. McKENNA: Can I mark these two documents here as exhibits, please?
(Whereupon, Plaintiff's Exhibits No. 8 and No. 9 were marked.)
MR. McKENNA: Would you mark this exhibit, please?
(Whereupon, Plaintiff's Exhibit No. 10 was marked.)
BY MR. McKENNA:
Q. I've shown you two exhibits which have your signature on them. Do you see those in front of you?
A. These two OneBeacon Insurance Group LLC

Page 63

reports?
Q. Yes.
A. Yes.
Q. Could you identify the exhibit and just tell us whether your signature is on the bottom of each exhibit?
A. Exhibit 8 is a 2005 annual report of a foreign limited liability company, OneBeacon Insurance Group LLC, dated January 20, 2005. That is my signature.
Exhibit 9 is for the same entity. That's the original application for registration as a foreign LLC in Massachusetts. It's dated January 22, 2002 and that is also my signature.
Q. And the final exhibit I would like to show you to your immediate right, if you could just take a moment to look at it, and particularly the headline where it indicates that OneBeacon Insurance Group is looking for employees. Do you see that purported advertisement for jobs?
A. Yes, I do.
Q. As I understand your testimony, it's not actually OneBeacon Insurance Group that employs people in the group, it's actually OneBeacon Insurance Company?

Page 64

A. That's correct.
Q. That advertisement for jobs that I've showed you in front of you would appear to you to be inaccurate, is that correct?
A. Yes.
MR. McKENNA: That's it.
MR. BENGTSON: You're all done?
MR. McKENNA: Yes.
MR. BENGTSON: That's the end of the depo?
MR. McKENNA: Yes.
MR. BENGTSON: All right. I need a mini copy, four to a page, one side, and all of the exhibits, please.
(Adjourned at 12:43 p.m.)

Page 65

CERTIFICATE

I, Vivian S. Dafoulas, Notary Public in and for the Commonwealth of Massachusetts, do hereby certify there came before me on the 21st day of February, 2006, the deponent herein, who was duly sworn by me; that the ensuing examination upon oath of the said deponent was reported stenographically by me and later reduced to print through computer-aided transcription; and that the foregoing transcript is a true record of the questions asked and answers given at said deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and, furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this 22nd of February, 2006.

Vivian S. Dafoulas
Notary Public
Commonwealth of Massachusetts
My commission expires 7/10/09

WITNESS SIGNATURE

JAMES P. LAPLANTE
vs.
ONEBEACON INSURANCE GROUP
DEPOSITION OF:
DENNIS SMITH
February 21, 2006

I hereby certify that I have read the foregoing transcript and the same contains a true and accurate recording of my answers to the questions therein set forth, subject to the change(s) and/or correction sheet(s) attached.

________________________
SIGNATURE OF DEPONENT

STATE OF______________

Subscribed and sworn to before me this_____day of______________, 2006.

________________________
NOTARY PUBLIC

(My commission expires:________________________)



CORRECTION SHEET

DEPOSITION OF:
DENNIS SMITH
February 21, 2006

PAGE # LINE #

NOW READS: CORRECTION REQUESTED:





44d59ef1-f3b2-45f9-b7a5-4c217ed5fd9d